# Exhibit 1



February 5, 2016

AT #2015_338_334161749
MR#2016_035_534164574

MedPro Health Providers LLC
Attention: Delia Stockton, Office Manager
16335 S. Harlem Avenue, Suite 350
Tinley Park, Illinois 60477

Re:  Medical Records Request
      NPI: 1073820049

**ADVANCEMED
ZONE 3**

**MAR 2 2 2016**

**RICHMOND**

Dear Ms. Stockton:

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, the Centers for Medicare and Medicaid Services (CMS) is authorized to contract with entities to fulfill program integrity functions for the Medicare program.  These entities are called Zone Program Integrity Contractors (ZPIC). AdvanceMed is the ZPIC for Medicare Part A and B services in the state in which you practice.  As the ZPIC, AdvanceMed performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare program.

42 § C.F.R. 405.980 states that a contractor may reopen claims within four years of the paid date for Good Cause.  Good Cause is defined in 42 § C.F.R. 405.986 as:

- New and material evidence not available at time of determination that may result in a different conclusion
- Obvious error at time of determination

In accordance with 42 § C.F.R. 405.980 , AdvanceMed is reopening the claims associated with the below list of beneficiaries for Good Cause. This request is in conjunction with a reopening of claims being performed on  for services billed for patients within your home health facility.  We are requesting that you please provide any and all medical records related to services performed on the attached list of beneficiaries and the specified dates of service.

The records requested include, but are not limited to, the each beneficiary, for services delivered during the requested time periods:

- A copy of the current Medicare patient census roster to include beneficiary names, addresses, phone numbers and HICNs
- Copy of claim, if available  ~ κ κ

- Beneficiary Notice of Liability
- Authorization of Benefits
- Consent for Treatment
- Signed HIPPA Privacy Notification Forms
- Signature card including the printed names and signatures of all personnel documenting in the beneficiary's chart
- A list of any abbreviations and/or symbols used in documentation
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's chart and/or performing services
- Admission Notes
- Discharge Notes
- OASIS to include the start of care, the resumption of care certification prior to and after the dates of services noted in this request and the discharge
- Face to Face visit documentation to cover all dates of service requested and for dates of service prior to and after the dates of service requested
- Physician Plan of Care
- Home Health referral Form
- Notes From the following and any licensed personnel who has provided care or documented in the record:
  - o Physician
  - o Nurse Practitioner
  - o Nursing
  - o Home Health Aide
  - o Physical Therapy (Include evaluations and plans of care)
  - o Occupational Therapy (Include evaluations and plans of care)
  - o Speech Language Pathologist (Include evaluations and plans of care)
  - o Medical Social Worker
  - o Dietician
- Comprehensive Assessment
- Physician Orders
- Laboratory Reports
- Any diagnostic testing reports
- Inpatient Medical Record
- Medication List(s)/profile(s)/reconciliation(s)
- History and Physical(s)
- Hospital Discharge Summary if applicable
- Any inpatient records promoting start of care
- Any inpatient records during certification period(s)
- All wound care documentation
- Emergent Care records
- If electronic signatures used, documentation to verify the entries are appropriately authenticated, dated; the system has safeguards to prevent unauthorized access, and a process for reconstruction.
- Any and all other documentation to support services billed

- Please note that any orders and certifications need to be current for the reviewed date of service.

Please send within 30 days from the date of this letter the requested documentation, along with a copy of this letter, to the following address

AdvanceMed, Inc
Attn: Renu Sharma/ZPIC Zone 3
1530 E. Parham Road
Henrico, Virgina 23228

In addition to the above noted items, please include the name and version of any software being used for medical record documentation. If your medical record documentation includes abbreviations and/or symbols, please include a listing with definitions for these items.

If you have electronic medical records or have the capability of scanning your medical records, notes, photographs, x-rays, or other documentation to a CD in a PDF file format, we will accept these records in place of paper copies. Please ensure that all documentation for each beneficiary is in the same file location and identifiable by the beneficiary name or number. In an effort to protect the health information contained on the CD, we ask that you please password-protect the CD prior to forwarding to AdvanceMed and provide a contact person at your office for password retrieval. [Office of Management and Budget (OMB) Paperwork Reduction Act #: 0938-0969]

Release of this information is authorized by the patient's or authorized person's signature on the Centers for Medicare and Medicaid Services 1500 Form, Item 12. The guidelines printed on the back of the 1500 Form state that a patient's signature authorizes the release of any information necessary to process the claims. It also authorizes payment of benefits to the provider when the provider accepts assignment on the claim.

The Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations. AdvanceMed is a Zone Program Integrity Contractor that performs health care operations as a business associate of the Centers for Medicare and Medicaid Services. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

It should be noted that pursuant to the Privacy Act of 1974, any medical information obtained by our office, including that which is marked "confidential," is subject to disclosure to the individual to whom it pertains (e.g. the beneficiary), either directly or through designated professional medical personnel.

You are required to furnish to the intermediary or carrier sufficient information to determine whether payment is (or was) due and the amount of payment [See 42 CFR 424.5(a)(6)]. The Social Security Act Section 1833(e) states that no payment shall be made to any provider of services unless there has been

furnished such information as may be necessary in order to determine the amounts due such provider.  If no documentation is received, the services billed will be denied for no supporting documentation and an overpayment will be sought.

Per 42 CFR §424.535(a)(8)(ii), CMS has the authority to revoke a currently enrolled provider or supplier's Medicare billing privileges and any corresponding provider agreement based on a pattern or practice of submitting claims that fail to meet Medicare requirements. Should you continue to fail to meet these requirements as described above, your billing privileges may be revoked on this basis or any of the bases articulated in 42 CFR §424.535(a).

Medicare does not reimburse for the use of a copy service to copy medical records.  If you use a copying service, please be aware that Medicare will not reimburse for their services. Your cooperation and prompt reply is requested.

If you have any questions, please contact me at 614.801.2315.

Sincerely,

Zeke Kessbury
Program Integrity Analyst

Enclosure



## Medical Records Request List

| | |
|---|---|
| 7/6/13 | 9/3/13 |
| 5/11/15 | 7/9/15 |
| 3/21/15 | 5/19/15 |
| 7/19/15 | 9/16/15 |
| 2/2/13 | 4/2/13 |
| 7/21/13 | 9/17/15 |
| 2/2/13 | 4/2/13 |
| 7/21/15 | 9/17/15 |
| 12/1/14 | 1/29/15 |
| 5/30/15 | 7/28/15 |
| 8/28/13 | 10/26/13 |
| 8/2/15 | 9/26/15 |
| 3/19/13 | 5/17/13 |
| 6/17/15 | 8/15/15 |
| 5/31/13 | 7/29/13 |
| 5/30/15 | 7/28/15 |
| 4/30/15 | 6/28/15 |
| 6/29/15 | 8/27/15 |
| 4/30/15 | 6/28/15 |
| 6/29/15 | 8/27/15 |
| 8/12/13 | 10/10/13 |
| 2/8/14 | 4/8/14 |
| 6/28/13 | 8/26/13 |
| 2/23/14 | 4/23/14 |
| 3/16/15 | 5/14/15 |
| 7/14/15 | 9/11/15 |
| 3/16/15 | 5/14/15 |
| 7/14/15 | 9/11/15 |
| 2/19/13 | 4/19/13 |
| 4/30/15 | 6/28/15 |
| 2/19/13 | 4/19/13 |
| 4/30/15 | 6/28/15 |

2118 Southwest Boulevard • Grove City, OH 43123
Voice: 614.801.2306 • Fax: 614.801.2305
www.netinc.com

02/05/2016  18:43   6148812365                    ADVANCEMEDCORP                    PAGE  07/08

## Acknowledgement of Completion

Upon fulfilling the request for records, I certify that _Med'ro Health Providers_
provided all existing medical records and supporting documentation to substantiate payment of the
Medicare claims within the list attached to this request by AdvanceMed.

_DELIA STOCKTON — OFFICE MANAGER_
Custodian of records and Job Title    (Print)

_____          _3/4/16_
Custodian of records        (Signature)              (Date)


_____
Physician/Supplier            (Print)


_____        _____
Physician/Supplier            (Signature)              (Date)


Please acknowledge any and all documentation submitted by your office for the purpose of the Post
Payment Medical Records Request.

- A copy of the current Medicare patient census roster to include beneficiary names, addresses,
  phone numbers and HICNs
- Copy of claim, if available
- Beneficiary Notice of Liability
- Authorization of Benefits
- Consent for Treatment
- Signed HIPPA Privacy Notification Forms
- Signature card including the printed names and signatures of all personnel documenting in the
  beneficiary's chart
- A list of any abbreviations and/or symbols used in documentation
- Copy of licenses and/or certifications for all personnel documenting in the beneficiary's chart
  and/or performing services
- Admission Notes
- Discharge Notes

02/05/2016  16:43   6148012365              ADVANCEMEDCORP              PAGE  08/08

- OASIS to include the start of care, the resumption of care certification prior to and after the dates of services noted in this request and the discharge
- Face to Face visit documentation to cover all dates of service requested and for dates of service prior to and after the dates of service requested
- Physician Plan of Care
- Home Health referral Form
- Notes From the following and any licensed personnel who has provided care or documented in the record:
  - o  Physician
  - o  Nurse Practitioner
  - o  Nursing
  - o  Home Health Aide
  - o  Physical Therapy (Include evaluations and plans of care)
  - o  Occupational Therapy (Include evaluations and plans of care)
  - o  Speech Language Pathologist (Include evaluations and plans of care)
  - o  Medical Social Worker
  - o  Dietician
- Comprehensive Assessment
- Physician Orders
- Laboratory Reports
- Any diagnostic testing reports
- Inpatient Medical Record
- Medication List(s)/profile(s)/reconciliation(s)
- History and Physical(s)
- Hospital Discharge Summary if applicable
- Any inpatient records promoting start of care
- Any inpatient records during certification period(s)
- All wound care documentation
- Emergent Care records
- If electronic signatures used, documentation to verify the entries are appropriately authenticated, dated; the system has safeguards to prevent unauthorized access, and a process for reconstruction.
- Any and all other documentation to support services billed

* Please note that any orders and certifications need to be current for the reviewed date of service.

# Exhibit 2

 

April 26, 2017

Jurisprudence Health Law Group PC
Attn: Michael J. Raiz and Lesley Arca
1260 Iroquois Avenue, Suite 104
Naperville, IL 60563

Re:     **Notice of Termination of Suspension of Medicare Payments – MedPro Health
        Providers, LLC
        Provider Medicare ID Number: 148246
        Provider NPI: 1073820049**

Dear Attorney Raiz and Attorney Arca:

Pursuant to 42 C.F.R. § 405.372(c), this is to notify you that the Centers for Medicare &
Medicaid Services (CMS) has directed us to terminate the payment suspension in effect for
MedPro Health Providers, LLC's (MedPro) Medicare payments. You were notified of the results
of our review and the overpayment(s) we determined on April 26, 2017. This information has
been forwarded to Palmetto GBA for final action. In the near future, they will issue the
overpayment demand letter, along with information regarding MedPro's appeal rights and
process. When the payment suspension has been removed, any money withheld as a result of this
action shall first be applied to reduce or eliminate any overpayment and then to reduce any
obligation to the CMS or the U.S. Department of Health and Human Services per 42 C.F.R. §
405.372(e). In the absence of a legal requirement that the excess be paid to another entity, the
excess will be released to MedPro.

**Please be advised that this action to terminate MedPro's payment suspension should not be
construed as any positive determination regarding their Medicare billing, nor is it an
indication of government approval of or acquiescence regarding the claims submitted. It
does not relieve MedPro of any civil or criminal liability, nor does it offer a defense to any
further administrative, civil or criminal actions against MedPro.**

Should you have any questions, please contact me in writing or via telephone at 740-575-3098.

Sincerely,

Stormy Renner
Sr. Program Integrity Analyst

Cc:     James Burke, PI Manager
        Kathlene Gruettner, PI Supervisor

AT:     2015_338_334161749

Exhibit 3




April 26, 2017

Jurisprudence Health Law Group PC
Attn:  Michael J. Raiz and Lesley Arca
1260 Iroquois Avenue, Suite 104
Naperville, IL  60563

RE:     Results of Post-Payment Review – MedPro Health Providers, LLC
         Medicare Provider Transaction Access Number (PTAN): 148246
         National Provider Identifier (NPI): 1073820049

Dear Attorney Raiz and Attorney Arca:

As you know, most Medicare providers strive to work ethically, render high-quality medical care to their patients, and submit proper claims for payment. The Federal Government places enormous trust in providers, relying on their medical judgment to treat patients with appropriate services, and to submit accurate and truthful claims information when seeking reimbursement. *As a Medicare provider, MedPro Health Providers, LLc (MedPro) plays a vital role in protecting the Medicare Program.*

You are receiving this letter as a result of a Medicare program integrity review conducted by AdvanceMed. This letter serves as additional education regarding these findings, as explained in more detail below.

**Statutory Basis for AdvanceMed's Actions**

In accordance with section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II §202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, CMS is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program.  Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPIC) to perform these functions. AdvanceMed is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, AdvanceMed performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

**Scope of Review**

AdvanceMed conducts reviews based on information from various sources, including but not limited to: 1) requests from CMS or the Office of the Inspector General (OIG); 2) data analysis; 3) complaints; and 4) inquiries from various entities.  Our review was prompted by receipt of information that suggests MedPro is providing home health services to beneficiaries who are not homebound and/or do not have a skilled home health need.

Based on this information, on February 5, 2016, AdvanceMed requested medical records fromMedPro for dates of service February 2, 2013 through September 26, 2015. AdvanceMed reviewed 32 claims which included 838 services.  **Based on the claims and supporting documentation we reviewed, we identified**

---

[1]  UPIC Midwestern consists of the following states:  Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

**overpayments made to MedPro**.  This letter constitutes formal notice to MedPro of the outcomes of our review, as well as any actions MedPro should take.

**Outcome of the Review and Education**

The medical review resulted in the following general findings:

- Invalid physician certification
- Invalid physician re-certification
- Invalid or missing physician orders
- Services not reasonable and necessary
- Dependent services not reasonable and necessary

The following are specific examples of our findings, designed to help MedPro better understand coverage criteria. The rationale listed below are not exhaustive.  Please refer to the documents contained on the included secured CD for detailed information about the coverage decision on each reviewed claim.

**Dependent Services**
- In order to allow dependent services, a qualifying skilled service such as skilled nursing care, physical therapy, speech-language pathology services and/or a continued need for occupational therapy must be ordered and reasonable and necessary.
  - The home health aide visits were non-covered as the skilled services (Skilled Nursing, Physical Therapy, Speech-Language Pathologist and/or continuing Occupational Therapy) were denied.
  - The medical social worker visits were non-covered as the skilled services (Skilled Nursing, Physical Therapy, Speech-Language Pathologist and/or continuing Occupational Therapy) were denied.
  - The supplies were non-covered as the skilled services (Skilled Nursing, Physical Therapy, Speech-Language Pathologist and/or continuing Occupational Therapy) were denied.

**Dependent services not reasonable and necessary**
- Medicare requires that the reason for the home health aide visit must be to provide hands on personal care or services needed to maintain the patient's health or to facilitate treatment of the patient's illness or injury.
  - The documentation and/or beneficiary interview supported there was an able and willing caregiver to provide the personal care services; therefore, the home health aide services were denied as not reasonable and necessary.
- Medicare requires the medical social worker visits be provided to resolve social, emotional and other problems that were, or were expected to be, an impediment to the effective treatment of the beneficiary's medical condition or rate of recovery and that these services required the skills of a medical social worker.
  - The documentation did not support the medical social worker services were reasonable and necessary for problems that were, or were expected to be, an impediment to the effective treatment of the beneficiary's medical condition or rate of recovery.

**Homebound**
- To qualify for Medicare coverage of home health services, a beneficiary must be confined to his/her home.
  - o Documentation did not support that the beneficiary's psychiatric condition rendered them homebound.
    - ▪ The medical record documentation did not support the beneficiary's psychiatric condition was manifested in part by a refusal to leave the home.
    - ▪ The medical record documentation did not support the beneficiary's psychiatric condition was of a nature that it would not be considered safe for the patient to leave home unattended.
  - o Documentation did not support the beneficiary met the homebound criteria. The documentation did not support the beneficiary required supportive devices; special transportation; or the assistance of another person to leave their home.. The documentation did not support a normal inability to leave the home existed and leaving the home required a considerable and taxing effort.

**Physician Certification**
- Payment for home health services can be made only if a physician certifies services were needed because the patient was confined to the home; the patient needed skilled nursing services on an intermittent basis, or physical therapy, or speech-language pathology services; the services were furnished while the patient was under the care of a physician; and that a face-to-face encounter was completed within the guideline requirements
  - o The physician certification was invalid as the physician's signature and/or date was invalid.
  - o The submitted Face to Face documentation was invalid.
    - ▪ No supportive documentation was submitted from the certifying physician's medical records and/or acute/post-care facility's medical records (required for episodes with Start of Care (SOC) as of 5/11/2015).
    - ▪ The documentation submitted from the certifying physician's medical records and/or acute/post-care facility's medical records did not support the need for skilled services and/or homebound status (required for episodes with Start of Care (SOC) as of 5/11/2015).
    - ▪ The Face to Face documentation did not contain a narrative (required for episodes with Start of Care (SOC) as of 4/1/2011through 5/10/15).
    - ▪ The Face to Face documentation did not contain a valid physician's narrative that sufficiently described how the clinical findings of the encounter supported the patient's homebound status and/or need for skilled services (required for episodes with Start of Care (SOC) as of 4/1/2011 through 5/10/2015).
    - ▪ The Face to Face encounter did not occur 90 days prior to start of care or within 30 days after start of care.
    - ▪ The physician signature and/or date on the Face to Face were invalid.

**Physician Orders**
- As a basis for Medicare payment, a physician must order all home health services rendered and billed.
  - o No physician's order(s) submitted for the services billed.
    - ▪ The physician verbal order was not obtained prior to services being rendered.
  - o The physician's order/orders were invalid.

- ▪ The physician's order(s) was not signed and/or dated by the physician prior to billing of the claim.
- ▪ The physician's signature and/or date on the physician verbal order/orders were invalid.

**Physician Re-Certification**
- • As a basis for Medicare payment, at the time of the recertification of home health services, the physician must include an estimate of how much longer the skilled services will be required (effective 5/11/2015).
  - ○ An estimate by the physician regarding how much longer the skilled services would be required was not included in the submitted documentation.

**Plan of Care**
- • Medicare requires that payment can be made only if a physician establishes a plan of care.
  - ○ The submitted Plan of Care was invalid as the physician's signature and/or date were invalid.

**Services not reasonable and necessary**
- ▪ To be considered reimbursable by Medicare the services must be reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member. To qualify for Medicare coverage of home health services a patient must be in need of intermittent skilled nursing services, physical therapy, speech-language pathology or continuing occupational therapy.
  - ○ Medicare only covers the services of a nurse to administer medication(s) that are reasonable and necessary to the treatment of an illness or injury.
    - ▪ No qualifying diagnosis was present in the documentation to support the administration of the B12 injection was reasonable and necessary.
  - ○ The documentation did not support the nursing services were reasonable and necessary for observation and assessment.
    - ▪ Skilled observation and assessment was no longer considered reasonable and necessary as the documentation indicated the abnormal findings were a part of a longstanding pattern of the patient's condition and no attempt was made to change the treatment to resolve them.
    - ▪ Skilled observation and assessment was not needed beyond a 3 week period as there was no information in the medical record supporting the likelihood of further complications or acute episodes.
    - ▪ The documentation did not support any new or changed treatments/medications requiring assessment by a skilled nurse.
    - ▪ The documentation did not support any new or exacerbated conditions requiring assessment by a skilled nurse.
  - ○ The documentation did not support the nursing services were reasonable and necessary for teaching and training related to treatment of the patient's functional loss, illness or injury.
    - ▪ When it becomes apparent, after a reasonable period of time, that the patient, family, or caregiver will not or cannot be trained, then further teaching and training would cease to be reasonable and necessary.
  - ○ The documentation did not support the nursing services were reasonable and necessary for treatment of an illness or injury.
    - ▪ The documentation did not support the wound treatment was skilled.

o    The documentation submitted did not support the therapy services provided were reasonable and necessary for the treatment of the patient's illness or injury or for the restoration or maintenance of function affected by the patient's illness or injury.
o    Therapy visits are partially denied; the documentation submitted indicated more therapy visits were provided than were reasonable and necessary.

AdvanceMed also noted the following trends persistent throughout the medical review: Beneficiaries were enrolled to received home health services who: 1) had long standing and/or chronic medical conditions, 2) after many ongoing episodes of service, the beneficiaries clinical condition remained the same or unchanged, 3) were already independent in the areas that indicated ongoing teaching occurred even when the goals were met or there was a willing caregiver, and 4) the skilled nursing services being ordered did not require the skills of a nurse. According to the data in HIMR (Health Insurance Medical Records), the enrolled beneficiaries were receiving numerous episodes of care from MedPro.

During this medical review, it was noted that MedPro provided home health care services for skilled nursing, physical therapy and home health aide services for multiple episodes to beneficiaries who had chronic or longstanding diagnosis and had received services from MedPro for many episodes. There was adequate time for teaching to occur or to make other arrangements. Clinical documentation submitted did not support a need for the ongoing skilled nursing, physical therapy and home health aide services. Also noted, clinical documentation remained unchanged or was duplicated from visit to visit and it was also noted to be duplicated from beneficiary to beneficiary and no overall change or improvement in clinical status occurred from episode to episode. Many of the beneficiaries in this medical review were receiving concurrent in home care provided by family or a caregiver and often the documentation indicated the skilled nurse training was for the caregiver. Of note, many couples were enrolled in home health services and the documentation indicated one of the spouses was the care taker for the other spouse, both receiving home health services.

**References/Citations:**
Social Security Act
1814(a)(2)(C)
1815(a)
1835(a)(2)(A)
1862(a)(1)(A)

42 Code of Federal Regulations
Sections 409.41, 409.42, 409.43, 409.44, 409.48, 424.22, 424.5(a)(6)

Center for Medicare and Medicaid Services
Publication 100-01, Medicare General Information, Chapter 4, Section 30
Publication 100-02, Medicare Benefit Policy Manual, Chapter 7, Sections 20, 30, 40, 50
Publication 100-04, Medicare Claims Processing Manual, Chapter 10, Section 10
Publication 100-08, Medicare Program Integrity Manual, Chapter 3, Section 3

Based on our findings as explained in this letter, AdvanceMed has determined that MedPro has been overpaid by Medicare in the amount of **$ 92,276.14**. MedPro should keep this letter and all attached documentation for their records. **This is not a demand letter; MedPro will be notified at a later date by your Medicare Administrative Contractor (MAC) regarding the amount due, potential repayment options, and any formal appeal processes MedPro may pursue.** The CMS publication "Medicare Overpayments" explains more about overpayments: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/OverpaymentBrochure508-09.pdf.

Accompanying this letter is an encrypted CD containing an electronic copy of this letter, a Claim Line Spreadsheet listing the claims filed for invalid physician certification, services not reasonable and necessary, etc. and various references cited in this letter. Specific information regarding these findings, per claim, is explained in the attached Key of Findings and Claim Decision Spreadsheet. All documents are contained within a password protected ZIP file.

Again, MedPro should review the attachments, along with this letter, to ensure understanding of Medicare's coverage and payment requirements. Consider and implement corrections to billing procedures that could prevent such errors in the future. Further, we recommend MedPro maintain documentation of any changes they implement to their current processes or procedures as a result of the information provided herein.

Publications at the following links provides additional information MedPro needs to protect the Medicare Program, their patients their organization and their self.

- https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Avoiding_Medicare_FandA_Physicians_FactSheet_905645.pdf
- https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/Fraud_and_Abuse.pdf

If MedPro misrepresent, falsify, or conceal essential information required for payment of federal funds, then MedPro may be subject to civil or criminal liability, which can result in fine, imprisonment, civil penalty, and potential collateral consequences.

Additionally, CMS published a final rule regarding overpayments in the Federal Register on February 12, 2016 [CMS-6037-F] to provide clarity and consistency in the reporting and returning of self-identified overpayments: https://www.gpo.gov/fdsys/pkg/FR-2016-02-12/pdf/2016-02789.pdf.

**Provider Self-Disclosure Protocol**

If MedPro identify evidence of potential fraud, they may choose to voluntarily disclose this to the Office of Inspector General (OIG) under the Provider Self-Disclosure Protocol (SDP). The OIG's website explains further:

"Self-disclosure gives providers the opportunity to avoid the costs and disruptions associated with a Government-directed investigation and civil or administrative litigation.

OIG endeavors to work cooperatively with providers who are forthcoming, thorough, and transparent in their disclosures in resolving these matters. While OIG does not speak for the Department of Justice or other agencies, OIG consults with those agencies, as appropriate, regarding the resolution of SDP matters."

More information on voluntary disclosure is available on the OIG website:
http://oig.hhs.gov/compliance/self-disclosure-info/protocol.asp.

**Authority to Conduct Reviews**

Under *Section 1893* of the Act, AdvanceMed is required to conduct reviews of providers to ensure that Medicare claims have been appropriately billed. It is Congress' intent, as stated *in Section 1156* of the Act, that services and items will be: provided economically; of a quality which meets professionally recognized standards of health care; and supported by evidence of medical necessity. Services or items not proven to be reasonable or medically necessary are denied under *Section 1862(a)(1)* of the Act.

**Requirement to Provide Documentation upon Request**

*Section 1815(a)* of the Act and *Title 42 CFR Part 424.5(a)(6)* place the burden upon the provider to furnish such information as may be necessary if payment is (or was) due and the amount of the payment.

**Statutory Requirement: Medical Necessity**

Social Security Act:
*§1862(a)(1)* of the Act states, "Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services—(1)(A) which, except for items and services described in a succeeding subparagraph, are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

Laws governing Medicare are generally found in the Act as amended. Most provisions are in Title XVIII of the Act and may also be included in Title XI. Medicare regulations are found in Title 42 of the Code of Federal Regulations (CFR). Instructions are issued by CMS via *MLN Matters* articles, the Medicare Internet-Only Manuals (e.g., Pub. 100-02 and 100-04) and other means (e.g., by Medicare Administrative Contractors via bulletins, letters, notices, web articles).

**Statutory Requirement: Liability for Overpayments**

Our determinations were made in accordance with sections 1879 and 1870 of the Social Security Act (the Act) as well as the specific statutory and regulatory references provided in this letter.
- **Section 1879 of the Social Security Act** -The determinations which follow a §1862(a)(1) denial may require a decision if the beneficiary or provider knew or could have known that a service would not be covered by Medicare because it would be considered medically unnecessary. The provider is liable if it is determined the provider knew, or could reasonably have been expected to know, that the items or services provided were not covered under Medicare. The beneficiary is liable if it is determined the beneficiary knew, or could reasonably have been expected to know that the items or services provided were not covered under Medicare. However, the Medicare

program accepts liability if neither the beneficiary nor the provider knew, or could reasonably be expected to have known, that the services were not covered. Waiver of liability exists when both the beneficiary and the provider did not and could not reasonably have been expected to know that payment would not be made for services.

- **Section 1870 of the Social Security Act**- Section 1870 permits Medicare to not recover inappropriate payments with respect to an individual deemed without fault in having caused the overpayment. For the "without fault" provision to apply, the individual must have complied with all pertinent regulations and instruction materials. A provider is responsible for an overpayment if he/she knew or had reason to know that service(s) were not reasonable and necessary, and/or he/she did not follow correct procedures or use care in billing or receiving payment.

**Other Laws**

Other laws pertaining to penalties associated with Medicare fraud and abuse include:
- Social Security Act (SSA), Sections 1128A(a)(1) and 1128B(a)(1)
- Civil False Claims Act, 31 U.S.C. § 3729
- 18 U.S.C. § 1001, 1035, and 1347
- 18 U.S.C. § 1516, Obstruction of Federal Audit

Our goal is to ensure that MedPro is fully aware of the laws, regulations, and Medicare instructions which apply to them and other providers who furnish services or items to Medicare beneficiaries. We hope this information is helpful.

**AdvanceMed will continue to monitor future Medicare claim submissions in order to verify adherence to this education.**

In addition, we remind MedPro that the regulation at 42 CFR §424.535 authorizes us to revoke Medicare billing privileges under certain conditions. In particular, we note that per 42 CFR §424.535(a)(8)(ii), CMS has the authority to revoke a currently enrolled provider's or supplier's Medicare billing privileges if CMS determines that the provider or supplier has a pattern or practice of submitting claims that fail to meet Medicare requirements.

**This is not a demand letter. MedPro will be notified at a later date by Palmetto GBA regarding the overpayment due and the repayment and appeal options available to you.**

For the password to the enclosed encrypted CD or if you have any questions, please contact me at 740.575.3098.

Sincerely,

Stormy Renner
Sr. Program Integrity Analyst

AT #: 2015_338_334161749

<u>Enclosed CD</u>

1. Medical Records Request Letter
2. Medical Review.
   a. Claim Line Decision Spreadsheet
   b. Medical Review Export
   c. Citations applicable to the medical review
3. Signed Digital Copy of Overpayment Determination / Education letter

# Exhibit 4


**advancemed**
An NCI Company



April 26, 2017

Jurisprudence Health Law Group PC
Attn: Michael J. Raiz and Lesley Arca
1260 Iroquois Avenue, Suite 104
Naperville, IL 60563

RE: Post-payment Review Results and Overpayment Determination
MedPro Health Providers, LLC
Provider Number: 148246
NPI: 1073820049
EIN: 26-4671376

Dear Attorney Raiz and Attorney Arca:

You are receiving this packet as a result of a Medicare Program Integrity Post-Payment Review conducted by AdvanceMed. This letter and the attachments hereto serve to provide MedPro Health Providers, LLC, (MedPro) with detailed information on the results of our review as well as supply MedPro and their staff with additional education regarding our findings. In accordance with Section 1893 of the Social Security Act [42 U.S.C. 1395ddd] and Title II § 202 of the Health Insurance Portability and Accountability Act (HIPAA) of 1996, the Centers for Medicare & Medicaid Services (CMS) is authorized to contract with entities to fulfill requirements of the Medicare Integrity Program. Section 6034 of the Deficit Reduction Act (DRA) of 2005 established the Medicaid Integrity Program. CMS utilizes Unified Program Integrity Contractors (UPIC) to perform these functions. AdvanceMed is the UPIC for the Midwestern Jurisdiction[1]. As the UPIC, AdvanceMed performs program integrity activities aimed to reduce fraud, waste, and abuse in the Medicare and Medicaid programs.

As a result of the findings contained herein, AdvanceMed has determined that MedPro has been overpaid by Medicare in the amount of **$6,937,712.00**. MedPro should keep this letter and all attached documentation for their records. **This is not a demand letter; MedPro will be notified at a later date by Palmetto GBA regarding the amount due, potential repayment options and various appellate procedures available to them.**

Our goal is to ensure that MedPro is fully aware of the basis for the amount determined as an overpayment, the authority involved in the review process and also the laws, regulations, and Medicare instructions which apply to you and other providers who furnish services or items to Medicare beneficiaries.

For the password to the enclosed CD or if you have any questions, please contact me at 740.575.3098.

Sincerely,

Stormy Renner
Sr. Program Integrity Analyst

---

[1] UPIC Midwestern consists of the following states: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, Ohio and Wisconsin.

# TABLE OF CONTENTS

I.        Facts .................................................................................................................. 3

II.      Reopening of Claims............................................................................................ 3

III.     Medical Review for Program Integrity Purposes.................................................. 4

IV.     Statistical Methodology ..................................................................................... 8

V.       Waiver of Liability............................................................................................. 9

VI.     Closing ............................................................................................................ 11

## Enclosed CD

1.  Medical Review
    A.  Medical Records Request letter
    B.  Signed Acknowledgment of Completion of medical records request
    C.  Claim Line Decision Spreadsheet
    D.  Medical Review Detail
    E.  Citations
    F.  Statistical Sampling for Overpayment (SSOE) Report
    G.  Extrapolation Report
    H.  Signed Copy of Extrapolated Overpayment letter

2.  Statistical Methodology.
    A.  Universe
    B.  Sample Frame(s)
    C.  Random Sample
    D.  Sampling Plan Document
    E.  Overpayment Extrapolation Report
    F.  Statistical Sampling for Overpayment Estimation Methodology
    G.  Sample Size Estimates Generated by RAT-STATS
    H.  Random Numbers Generated by RAT-STATS
    I.  RAT-STATS Extrapolation Report

## I. Facts

This section will detail the factual findings which formed the basis of this investigation and led to the decision to reopen the sample of claims associated with MedPro. Factual findings discovered subsequent to the reopening of the sample will be detailed throughout the later sections of this document.

On November 16, 2016, MedPro was notified of Centers for Medicare & Medicaid Services' (CMS) decision to suspend their Medicare payments based on reliable information that an overpayment exists or "credible allegations of fraud" that payments to be made may not be correct. Specifically, the suspension of MedPro's Medicare payments is based on, but not limited to, a review of medical records obtained, from MedPro, on March 22, 2016. The medical review found evidence that MedPro was billing Medicare for services that were not medically reasonable or necessary and where the required face-to-face encounters and physician recertification were invalid. On January 5, 2017, AdvanceMed requested medical records for a Statistical Sampling for Overpayment Estimation (SSOE) of claims with paid dates from February 1, 2013 through December 22, 2016.

The requested medical records from the SSOE of claims were received on January 27, 2017. Medical review of the claims from the SSOE resulted in a 70% denial rate and an extrapolated overpayment of $6,937,712.00.

## II. Reopening of Claims

AdvanceMed constructed a statistically valid random sample of claims for overpayment estimation with paid dates from February 1, 2013 through December 22, 2016. On January 5, 2017, AdvanceMed reopened the claims in accordance with 42 C.F.R § 405.980, based on the oldest paid date in the sample of February 1, 2013, and requested all medical records[2] and supporting documentation from the Provider that supports the billing of the selected sample claims.

When conducting a post payment program integrity medical review of claims, AdvanceMed must adhere to the reopening rules set forth at 42 C.F.R. § 405.980(b). The regulation establishes the time frame for reopening initial determinations and redeterminations initiated by a contractor. In pertinent part, the regulation provides:

> A contractor may reopen and revise its initial determination or redetermination on its own motion,
> 1) Within one year from the date of the initial determination or redetermination for any reason.
> 2) Within four years from the date of the initial determination or redetermination for good cause as defined in § 405.986.
> 3) At any time if there exists reliable evidence as defined in § 405.902 that the initial determination was procured by fraud or similar fault as defined in § 405.902.
> 4) At any time if the initial determination is unfavorable, in whole or in part, to the party thereto, but only for the purpose of correcting a clerical error on which that determination was based.
> 5) At any time to effectuate a decision issued under the coverage appeals process.

---

[2] Attachment 1: Copy of the Medical Records Request letter

As stated in 42 C.F.R. § 405.902, similar fault is defined as:

> Similar fault means to obtain, retain, convert, seek, or receive Medicare funds to which a
> person knows or should reasonably be expected to know that he or she or another for whose
> benefit Medicare funds are obtained, retained, converted, sought, or received is not legally
> entitled. This includes, but is not limited to, a failure to demonstrate that he or she filed a
> proper claim as defined in part 411 of this chapter.

The regulation addressing good cause for reopening is found at 42 C.F.R. § 405.986 and, as applicable here,
provides in pertinent part:

> a) Establishing good cause. Good cause may be established when-
>    1) There is new and material evidence that--
>       i) Was not available or known at the time of the determination or decision; and
>       ii) May result in a different conclusion ...

On January 5, 2017, AdvanceMed sent a written request to 16335 S. Harlem Avenue, Suite 350, Tinley
Park, Illinois 60477 for medical records associated with the sample of claims. Therefore, AdvanceMed is
within the four year window of time set forth in 42 C.F.R. § 405.980(b)(2). Good cause was determined
through data analysis that otherwise was not possible until a large amount of data was available to compare
and contrast. Consistent with CMS guidelines, this information constitutes good cause as set forth in 42
C.F.R. § 405.986.

The Medicare Claims Processing Manual (MCPM)(Pub. 100-4), chapter 34 §10.11.1 sets forth guidance
regarding the correlation between data analysis and the good cause basis.

> For example, data analysis that identifies a high error rate or pattern of potential
> overutilization on the part of a provider or supplier is one example of evidence that is not
> readily available or known to a contractor at the time it made its initial determination, and
> may cause the contractor to believe its initial determinations for the claims of the provider
> or supplier were incorrect.

The *Code of Federal Regulations* at 42 C.F.R. § 405.926 (l) sets forth in pertinent part: [a]ctions that are
not initial determinations and are not appealable ... include, but are not limited to--"[a] contractor's ...
determination or decision to reopen or not to reopen an initial determination, redetermination, ..."[3]

# III.    Medical Review for Program Integrity Purposes

---

[3] Four District Court decisions have directly addressed the issue of reopening and the correlated good cause prerequisite. *See, i.e., Hospital
Committee for Livermore-Pleasanton Areas v. Johnson*, 2010 WL 1222764 (the *Livermore* Court commented that "the agency did not say that
enforcement of good cause standard could also take place through the administrative appeal process ... Instead, the agency took the position...that
the good cause standard is to be enforced through internal procedures, not by a private action via an appeal".); *Trustees of Mease Hospital, Inc. v.
Sebelius*, 8:09-cv-1795-T-23MAP, 2010 U.S. Dist. Lexis 83506 (M.D.Fla. July 26, 2010) ("The federal regulations promulgated under the authority
vested in the Secretary clearly indicate the decision to reopen is not subject to review during the administrative appellate process and cannot be
raised by the provider." ); *Morton Plant Hospital Association, Inc. v. Sebelius*, 2010 WL 3943687 (the Medicare regulations grant ample
opportunities to review overpayment determinations, but the reopening regulations foreclose review of the decision to reopen, including the issue
of whether good cause existed to justify reopening the payment of a claim after the passage of one year from the initial or revised determination.);
*Palomar Medical Center v. Sebelius*, 2010 WL 2985837 (The Ninth Circuit District Court holds that it does not have jurisdiction to consider the
merits of the plaintiff's challenge to the reopening because it is not appealable under the plain language of the regulations and the Secretary's
interpretation, to which the Court must give deference).

This section provides a summary of the findings through medical review conducted by AdvanceMed. This letter and the corresponding attachments will serve to provide additional education regarding these findings. Please review the results contained in the attached Overpayment Spreadsheet to ensure a clear understanding of Medicare coverage and payment requirements, and consider whether corrections to billing procedures could prevent such errors in the future. All information regarding the medical review can be found on the **enclosed encrypted CD**.

The *Code of Federal Regulations* includes "Conducting medical reviews, utilization reviews, and reviews of potential fraud related to the activities of providers of services and other individuals and entities (including entities contracting with CMS under parts 417 and 422 of this chapter) furnishing services for which Medicare payment may be made either directly or indirectly" as one of the functions of a Medicare integrity program contractor. 42 C.F.R. § 421.304(a). The Medicare Program Integrity Manual (MPIM) (Pub. 100-08) delineates the focus of medical review for program integrity purposes from other forms of medical review as follows: The focus of MR units is to reduce the error rate through medical review and provider notification and feedback, whereas medical review for Program Integrity (PI) purposes focuses on addressing situations of potential fraud, waste and abuse. MPIM (Pub. 100-08), chapter 4 § 4.3. Therefore, the very nature of a UPIC's medical review function is to "investigate potential fraud on the part of providers, suppliers, and other entities who receive reimbursement under the Medicare program for services rendered to beneficiaries." MPIM, chapter 4 § 4.7.

> When the PSC and the UPIC PI units receive an allegation of fraud, or identify a potentially fraudulent situation, they shall investigate to determine the facts and the magnitude of the alleged fraud. They shall also conduct a variety of reviews to determine the appropriateness of payments, even when there is no evidence of fraud.

Pursuant to *Section 1893 of the Social Security Act* [42 U.S.C. 1395ddd], AdvanceMed is required to conduct reviews of providers to ensure that Medicare claims have been appropriately billed. *Sections 1815(a) of the Act* [42 U.S.C. 1395g] and *Section 1833(e) of the Act* [42 U.S.C. 1395l] place the burden upon the provider to furnish such information as may be necessary if payment is (or was) due and the amount of the payment. *See also*, 42 C.F.R. § 424.5(a)(6). It is Congress' intent, as stated in *Section 1156 of the Act* [42 U.S.C. 1320c–5] that services or items will be provided economically and will be of a quality which meets professionally recognized standards of health care, and will be supported by evidence of medical necessity. Services or items not proven to be reasonable or medically necessary are denied under *Section 1862(a)(1) of the Act* [42 U.S.C. 1395y].

The Overpayment Spreadsheet lists details for each claim line reviewed. The column titled, "Decision Description" lists whether a claim was allowed, denied, down-coded, or changed. The "Reason Code Description" and/or "Comment" columns reference the explanation for each decision made. The Medical Review Export document gives the explanation for AdvanceMed's line item decision along with the applicable Medicare guidelines.

The medical review for program integrity purposes was conducted using any and all documentation submitted by MedPro. On February 10, 2017, AdvanceMed received the requested medical records, and also received a signed Acknowledgement of Completion (Attachment 2) which details the documentation submitted by MedPro. Medical review for program integrity purposes was conducted on 30 claims / 720 claim lines, and resulted in a 70 % denial rate. The primary issues identified by medical review include:

Physician Orders
- As a basis for Medicare payment, a physician must order all home health services rendered and billed.
  - o  No physician's order(s) submitted for the services billed.
    - ▪  The number of visits was in excess of the amount ordered.
  - o  The physician's order/orders were invalid.
    - ▪  The physician's order/orders did not included all the frequency.

Services not reasonable and necessary
- To be considered reimbursable by Medicare the services must be reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member. To qualify for Medicare coverage of home health services a patient must be in need of intermittent skilled nursing services, physical therapy, speech-language pathology or continuing occupational therapy.
  - o  Medicare requires at defined points during a course of therapy treatment, for each therapy discipline for which services are provided, a qualified therapist (not an assistant) must perform the ordered therapy service to ensure the therapy services are effective. During this visit, the qualified therapist must assess and document measurement results and effectiveness of treatment in the clinical record. Each therapy discipline must complete an initial assessment and a reassessment at least every thirty days. For dates of service 5/5/2011 through 12/31/2014, reassessments were also required prior to the 14th and 20th therapy visit.
    - ▪  The therapy reassessment documentation did not contain functional reassessments, measurements or documentation of effectiveness of therapy, or lack thereof.
  - o  The documentation did not support the nursing services were reasonable and necessary for teaching and training related to treatment of the patient's functional loss, illness or injury.
    - ▪  When it becomes apparent, after a reasonable period of time, that the patient, family, or caregiver will not or cannot be trained, then further teaching and training would cease to be reasonable and necessary.

Services not Rendered
- As a basis for Medicare payment, the provider must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment.
  - o  The documentation submitted did not support that services billed were rendered
  - o  There was no documentation submitted for this date of service to support that services billed were rendered.

OASIS (Outcome and Assessment Information Set)
- Under the Prospective Payment System (PPS) an OASIS is a regulatory requirement, Medicare requires the OASIS be submitted in order to determine the level of care billed.
  - o  No OASIS was submitted to the repository for the episode under review. Effective January 1, 2010, submission of the OASIS to the state repository is a condition of payment. As of January 1, 2015, submission to the National Repository is a condition of payment.

Physician Certification
- Payment for home health services can be made only if a physician certifies services were needed because the patient was confined to the home; the patient needed skilled nursing services on an intermittent basis, or physical therapy, or speech-language pathology services; the services were

furnished while the patient was under the care of a physician; and that a face-to-face encounter was completed within the guideline requirements
- o   No Physician certification was submitted.
- o   The physician certification was invalid
  - ▪   The certification was not signed and/or dated by the physician prior to billing of the claim.
  - ▪   The physician signature and/or date on the certification were invalid.
- o   The submitted Face to Face documentation was invalid
  - ▪   No supportive documentation was submitted from the certifying physician's medical records and/or acute/post-care facility's medical records (required for episodes with Start of Care (SOC) as of 5/11/2015).
  - ▪   The Face to Face documentation did not contain a narrative (required for episodes with Start of Care (SOC) as of 4/1/2011through 5/10/15).
  - ▪   The Face to Face documentation did not contain a valid physician's narrative that sufficiently described how the clinical findings of the encounter supported the patient's homebound status and/or need for skilled services (required for episodes with Start of Care (SOC) as of 4/1/2011 through 5/10/2015).

Plan of Care
- •   Medicare requires that payment can be made only if a physician establishes a plan of care.
  - o   No Plan of Care was submitted
  - o   The submitted Plan of care was invalid
    - ▪   The physician's signature and/or date on the Plan of Care were invalid.
    - ▪   The Plan of Care was not signed and/or dated by the physician prior to billing of the claim.


Based on the findings in this review, AdvanceMed has determined just cause in requesting an overpayment. Pursuant to *Section 1893(f)(3) of the Social Security Act* [42 U.S.C. §1395ddd(f)(3)] statistical extrapolation was requested on all codes paid billed during the time period of February 1, 2013 through December 22, 2016. The decision to extrapolate is predicated on the finding of a high or sustained level of payment error. As a result of our findings, AdvanceMed has determined that a sustained or high level of payment error exists. The error rate was determined as: 66.48%. The error rate determination is based on the facts presented through this investigation, including, but not limited to: the medical review determinations and data analysis. As a result of our findings we have determined that you have been overpaid by Medicare in the amount of **$6,937,712.00**.

The decision to extrapolate is not subject to appellate review. 42 C.F.R. § 405.926(p) sets forth in pertinent part: actions that are not initial determinations and are not appealable … include, but are not limited to-- "determinations by the Secretary of sustained or high levels of payment errors in accordance with section 1893(f)(3)(A) of the Act…"

**References/Citations:**
<u>Social Security Act</u>
§1814(a)(2)(C) and §1835(a)(2)(A)
§1862(a)(1)(A) and §1815(a)
§1861(m)
§1895

42 Code of Federal Regulations
§§409.41, 409.42, 409.43, and 424.22
§424.22(a)(1)(v)
§424.5(a)(6)
§409.45
§§409.42, 409.44 and 424.22
§§484.20, 484.55, 484.210, 484.250
§409.43
§§484.20, 484.55, 484.205, 484.210

OASIS-C1/ICD-9 Version Guidance Manual
OASIS-C1/ICD-10 Version Guidance Manual

Centers for Medicare and Medicaid Services
Publication 100-01, Medicare General Information, Eligibility and Entitlement Manual, Chapter 4
Publication 100-02, Medicare Benefit Policy Manual, Chapter 7
Publication 100-04, Medicare Claims Processing Manual, Chapter 10
Publication. 100-08, Medicare Program Integrity Manual, Chapter 3

# IV.  Statistical Methodology

Please note that the enclosed Statistical Methodology Report contains a listing of the attachments and methodology needed to replicate the sample and extrapolate the results. Further, all of the referenced statistical information and data needed to replicate the sample and extrapolate the results has been provided on the **enclosed encrypted CD**.

As an alternative to individualized claims adjudication, sampling has been used by government agencies as a means to determine overpayments in instances involving large numbers of beneficiaries and claims.[4] CMS's sampling guidelines are found in the MPIM, chapter 8 § 8.4. The MPIM provides guidance to contractors in conducting statistical sampling for use in estimating overpayment amounts. The instructions are intended to ensure that a statistically valid sample is drawn and that statistically valid methods are used to project overpayments where review of claims indicates that overpayments have been made. The MPIM, chapter 8, § 8.4.1.1, describes the purpose of its guidance as follows:

> These instructions are provided so that a sufficient process is followed when conducting statistical sampling to project overpayments. Failure by the PSC or the UPIC PI unit or the contractor MR unit to follow one or more requirements contained herein does not necessarily affect the validity of the statistical sampling that was conducted or the projection of the overpayment.

AdvanceMed used approved software to select a sample of claims from a list of all relevant claims paid or partially paid to MedPro. Based on standard statistical formulas, a confidence interval was used to establish loss to the Medicare Trust Fund. AdvanceMed used the lower limit of the 90% one-sided confidence interval to establish the amount of the overpayment.

---

[4] *Chaves County Home Health Services v. Sullivan*, 931 F2d 914, 289 U.S. App. D.C. 276 (DC, 1991).

# V. Waiver of Liability

As a participating provider in the Medicare program, a provider is charged with knowledge of pertinent coverage requirements for services provided and billing procedures. A provider of services in the Medicare program also has a duty to familiarize itself with the legal requirements for cost reimbursement. Further, as a participating provider in the Medicare program, participants are considered to have constructive knowledge of CMS manual instructions, bulletins, contractors' written guides, and directives.

## A. *Waiver of liability under § 1879 of the Act*

*Section 1879 of the Social Security Act* [42 U.S.C. § 1395pp] permits Medicare payments to be made to providers on assigned claims for certain services otherwise not covered, if neither the beneficiary nor the provider knew, or could reasonably be expected to know, that the services were not covered. Services affected are those disallowed as not medically reasonable or necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member; or where such expenses are for custodial care.[5]

Providers are expected to be familiar with the coverage requirements/criteria of services billed. A Medicare provider is charged both with knowledge of the applicable regulations and with the understanding that Medicare would not provide reimbursement for services that are not demonstrably medically necessary and otherwise properly documented. Further, 42 C.F.R. § 411.406 states a provider, practitioner, or supplier is deemed to know that services are excluded from coverage as not medically necessary through:

(b) *Notice from the QIO, intermediary or carrier.* The QIO, intermediary, or carrier had informed the provider, practitioner, or supplier that the services furnished were not covered, or that similar or reasonably comparable services were not covered.

...

(e) *Knowledge based on experience,* actual notice, or constructive notice. It is clear that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage on the basis of the following:

(1) Its receipt of CMS notices, including manual issuances, bulletins, or other written guides or directives from intermediaries, carriers, or QIOs, including notification of QIO screening criteria specific to the condition of the beneficiary for whom the furnished services are at issue and of medical procedures subject to preadmission review by a QIO.

(2) FEDERAL REGISTER publications containing notice of national coverage decisions or of other specifications regarding non-coverage of an item or service.

(3) Its knowledge of what are considered acceptable standards of practice by the local medical community.

---

[5] *Section 1862 of the Social Security Act* [42 U.S.C. 1395y]

All of the grounds for denial of coverage set forth in AdvanceMed's determination are supported by applicable and easily accessible laws, rules, manuals, NCDs, LCDs and CMS transmittals. All applicable laws, policies, guidelines, and determinations are also provided in the **enclosed encrypted CD**.

Once AdvanceMed concluded that an overpayment existed (i.e., post-payment review, including §1879 of the Act waiver determination is complete), AdvanceMed will make a § 1870 determination regarding waiver of recovery of the overpayment from the provider. *See,* MPIM, exhibits: § 14.2.

## B. *Waiver of Liability under §1870 of the Act*

*Section 1870 of the Social Security Act* [42 U.S.C. § 1395gg] permits Medicare to not recover inappropriate payments with respect to an individual deemed without fault in having caused the overpayment. For the "without fault" provision to apply, the individual must have complied with all pertinent regulations and instruction materials. These include Current Procedural Terminology (CPT-4) procedure code definitions and Medicare bulletins. The individual is expected to have had a reasonable basis for assuming the payments received were correct or, if there was reason to question payment, to promptly bring such question to the contractor's attention. In addition, the individual is expected to have made full and accurate disclosure of material facts.

*Section 1870 (b) of the Act* provides for a waiver of recovery of an overpayment to a provider or supplier of services whenever that provider or supplier is without fault in incurring the overpayment. This section works in concert with 42 C.F.R. § 405.350(c), which states: "in the absence of evidence to the contrary," the provider shall "be deemed to be without fault if the determination of the carrier, the intermediary, or the Centers for Medicare & Medicaid Services that more than the correct amount was paid was made subsequent to the fifth year following the year in which notice was sent to such individual that such amount had been paid." *See, Social Security Act §1870 (b)(1)(B).*

Although the appropriateness of an overpayment in relation to the timeliness of the assessment is a presumption for which *Section 1870 (b)* extends, this presumption may be rebutted and the passage of the three-year period does not necessarily bar a finding of fault on a provider's part. CMS has stated in the Financial Management Manual (FMM), chapter 3 § 80, that an example of evidence to the contrary is a "pattern of billing errors." The vast majority of providers referred to a Medicare Administrative Contractor by a UPIC for overpayment recoupment have a documented pattern of billing errors, the Appellant in this matter being no exception.

Moreover, the FMM, chapter 3 § 90.1, sets forth the following scenarios, among others, in which a provider would not be eligible for waiver because of "evidence to the contrary." This includes:

- The provider furnished erroneous information or failed to disclose facts that it should have known were relevant to payment of the benefit
- The provider receives duplicate payments
- The provider does not submit documentation to substantiate that services billed the program were covered
- The provider does not submit documentation to substantiate that it performed the services billed to the program where there is a question as to whether the services were performed
- The provider billed or Medicare paid the provider for services that the provider should have known were non-covered; or

- For carriers, items or services were furnished by practitioner or supplier not qualified for Medicare reimbursement

AdvanceMed identified numerous billing errors on behalf of MedPro. AdvanceMed's Program Integrity review found 33% (10 out of 30) of the claims reviewed were not submitted to the repository. Of those 10 claims 7 were also denied for another reason in addition to the OASIS not being submitted, 6 for nursing and 8 for therapy were not reasonable and necessary. This is almost half of the claims that were reviewed. The trend in all of these *not reasonable and necessary* claims was that there were multiple consecutive home health visits without an exacerbation or change in condition. The nursing education was recycled from one claim to the next and the therapy did not contain clearly defined goals and functional re-assessment. The certifications and Plan of Care were missing either the date of service or it was signed/dated after the certification was billed.

Additionally, the length of the home health certifications averaged at four consecutive episodes, with some extending as long as twelve. There was no change noted in the chronic condition or the members' health, missing or invalid documentation, missing or invalid orders, and missing dates of service.

It is important that the management of any medical practice treating a significant number of Medicare beneficiaries understands the conditions governing which services will be reimbursed under the Medicare Program. Pertinent information is available from the Law and Regulations, Medicare Bulletins and from a provider's peers in the medical community. Lacking any information that the provider is "without fault", AdvanceMed has found that *Section 1870 of the Act* does not apply and that MedPro Health Providers, LLC is liable for the overpayment.

## VI.     Closing

**Again, this is not a demand letter; you will be notified at a later date by Palmetto GBA regarding the overpayment due and the repayment and appeal options available to you.**

In addition, we remind you that our regulation at 42 CFR §424.535 authorizes us to revoke Medicare billing privileges under certain conditions. In particular, we note that per 42 CFR §424.535(a)(8)(ii), CMS has the authority to revoke a currently enrolled provider's or supplier's Medicare billing privileges if CMS determines that the provider or supplier has a pattern or practice of submitting claims that fail to meet Medicare requirements.

For the password to the enclosed encrypted CD or if you have any questions, please contact me at 740.575.3098.

Sincerely,

Stormy Renner
Sr. Program Integrity Analyst

AT #: 2015_338_334161749

# Exhibit 5



**CENTERS FOR MEDICARE & MEDICAID SERVICES**

**MEDICARE**

A/B MAC Jurisdiction M

Letter Number: 22080280

Date: 04/28/2017

MEDPRO HEALTH PROVIDERS LLC
16325 HARLEM AVE
STE 350
TINLEY PARK, IL 604771753

**FIRST REQUEST**

RE : Claims Accounts Receivable - MMA 935
     Provider Name: MEDPRO HEALTH PROVIDERS LLC
     Provider Number: 148246-1073820049
     Outstanding Balance: $6,937,712.00

Dear Sir/Madam,

**This is to inform you that you have received a Medicare payment in error which has resulted in an overpayment of $6,937,712.00. This amount is subject to Section 935(f)(2) of the Medicare Modernization Act (MMA) (Section 1893(f)(2) of the Social Security Act), Limitation on Recoupment. The purpose of our letter is to request that this amount be repaid to our office. The attached listing explains how this happened.**

**Why you are responsible:**

You are responsible for being aware of correct claim filing procedures and must use care when billing and accepting payment in this situation. You billed and/or received payment for services you should have known you were not entitled to. Therefore, you are not without fault and are responsible for repaying the overpayment amount. If you dispute this determination please follow the appropriate appeals process listed below. Applicable authorities: Section 1870(b)(c) of the Social Security Act, Subsections 405.350 - 405.359 of Title 42 CFR, Subsections 404.506 - 404.509, 404.510a and 404.512 of Title 20 of the United States Code of Federal Regulations and 20 CFR.

**What you should do:**

Please return the overpaid amount to us by 05/27/2017 and no interest charge will be assessed.

We request that you refund this amount in full. If you are unable to make refund of the entire amount at this time, advise this office immediately so that we may determine if you are eligible

Palmetto GBA, LLC
2300 Springdale Drive, Camden, South Carolina 29020
www.PalmettoGBA.com/Medicare

for a repayment plan. Any repayment plan (where one is approved) would run from the date of this letter.

Make the check payable to Medicare Part A and send it with **a copy of this letter** to:

Palmetto GBA, LLC
P.O. Box 100277
Columbia, SC 29202

You may elect to have your overpayment(s) repaid through the immediate recoupment process and avoid paying by check or waiting for the standard recoupment process that begins on day 41 from date of the initial demand letter. A request for immediate recoupment must be received in writing no later than the 16th day from the date of initial demand letter. You must specify whether you are submitting:

1.  A one-time request for the current overpayment and all future overpayments, or

2.  A request for the current overpayment addressed in this demand letter only.

This process is voluntary and for your convenience. Your request must specifically state you understand you are waiving potential receipt of interest payment pursuant to Section 1893(f)(2) for the overpayments. Note: Such interest may be payable for certain overpayments reversed at the Administrative Law Judge (ALJ) level or subsequent levels of appeal.

Visit our website at www.PalmettoGBA.com/Medicare for additional information and instructions for **Immediate Recoupment.**

You may fax your request to the number mentioned at the end of this letter.

**Payment Withholding:**

If payment in full is not received by 05/27/2017, payments to you can be withheld (Recoupment) until payment in full is received or if you have not submitted an acceptable extended repayment request and/or a valid and timely appeal is received.

Please complete an extended repayment schedule (ERS) package if you are unable to make full payment at this time, and would like to request an ERS. Details for completing the ERS package are included on our Website at www.PalmettoGBA.com/Medicare. If you would like to receive an ERS package by mail, please call the telephone number listed at the end of this letter.

**Rebuttal Process:**

Under our existing regulations 42 CFR section 405.374, Providers and other Suppliers will have 15 days from the date of this demand letter to submit a statement of opportunity to

rebuttal. The rebuttal process provides the debtor the opportunity to submit a statement and/or evidence stating why recoupment should not be initiated. The outcome of the rebuttal process could change how or if we recoup. If you have reason to believe the withhold should not occur on **06/07/2017**, you must notify this office before **05/12/2017**. We will review your documentation. Our office will advise you of our decision in 15 days from receipt of your request. However, this is not an appeal of the overpayment determination, and it will not delay recoupment before a rebuttal response has been rendered.

The rebuttal statement does not cease recoupment activities consistent with section 935 of the MMA.

**How to Stop Recoupment:**

Even if the overpayment and any assessed interest has not been paid in full you can stop Medicare from recouping any payments. If you act quickly and decidedly, Medicare will permit providers to **stop recoupment** at two points. The first occurs if we receive a valid and timely request for a redetermination within 30 days from the date of this letter. We will stop or delay recoupment pending the results of the appeal.

We will again stop recoupment if, following **an unfavorable or partially favorable redetermination** decision if you decide to act quickly and file a valid request for reconsideration with the Qualified Independent Contractor (QIC). The address and details on how to file a request for reconsideration will be included in the redetermination decision letter.

**What are the timeframes to stop recoupment:**

**First Opportunity:** To assist us in expeditiously stopping the recoupment process, we request that you clearly indicate on your appeal request that this is a 935 overpayment appeal for a redetermination to:

> Palmetto GBA, LLC - 935 APPEALS REDETERMINATION
> Attn: JM Medicare Part A Appeals, AG-630
> PO Box 100238
> Columbia, SC 29202-3238

**Second Opportunity:** If the redetermination decision is 1) **unfavorable** we can begin to recoup **no earlier than the 60th day** from the date of the Medicare redetermination notice (Medicare Appeal Decision Letter), or 2) if the decision is **partially favorable** we can begin to recoup no earlier than the 60th day from the date of the Medicare revised overpayment Notice/Revised Demand Letter. Therefore, it is important to act quickly and decidedly to limit recoupment by requesting a valid and timely reconsideration within 60 days of the appropriate notice/letter. The address and details on how to file a request for reconsideration will be included in the redetermination decision letter.

**What Happens following a reconsideration by a Qualified Independent Contractor (QIC):**

Page 4
Date : 04/28/2017
Letter Number : 22080280

Following **decision or dismissal** by the QIC, if the debt has not been paid in full, we will begin or resume recoupment whether or not you appeal to the next level of Administrative Law Judge (ALJ).

NOTE: Even when recoupment is stopped, interest continues to accrue.

**Interest Assessment:**

If you do not refund in 30 days: In accordance with 42 CFR 405.378 simple interest at the rate of 10 percent will be charged on the unpaid balance of the overpayment beginning on the 31st day. Interest is calculated in 30-day periods and is assessed for each full 30-day period that payment is not made on time. Thus, if payment is received 31 days from the date of final determination, one 30-day period of interest will be charged. Each payment will be applied first to accrued interest and then to principal. After each payment interest will continue to accrue on the remaining principal balance, at the rate of 10 percent. In addition, please note that Medicare rules require that payment be either received in our office by 05/27/2017 or use the United States Postal Service Postmark by that date for the payment to be considered timely. A metered mail postmark received in our office after 05/27/2017 will cause an additional month's interest to be assessed on the debt.

**Medicaid Offset:**

If this matter is not resolved, CMS may instruct the Medicaid State Agency to withhold the Federal share of any Medicaid payments that may be due you or related facilities until the full amount owed Medicare is recouped, Title 42 CFR, Section 447.30(g). These recoveries will be in addition to any recoupments from other Medicare funds due you until the full amount owed to Medicare is recovered.

**If you wish to appeal this decision:**

If you disagree with this overpayment decision, you may file an appeal. An appeal is a review performed by people independent of those who have reviewed your claim so far. The first level of appeal is called a redetermination. You must file your request for a redetermination within 120 days from the date of this letter. **However, if you wish to avoid recoupment from occurring, you need to file your request for redetermination within 30 days from the date of this letter as described above.** Unless you show us otherwise, we assume you received this letter 5 days after the date of this letter. Please send your request for redetermination to:

Palmetto GBA, LLC - 935 APPEALS REDETERMINATION
Attn: JM Medicare Part A Appeals, AG-630
PO Box 100238
Columbia, SC 29202-3238

Page 5
Date : 04/28/2017
Letter Number : 22080280

**If you have filed a bankruptcy petition:**

If you have filed a bankruptcy petition or are involved in a bankruptcy proceeding, Medicare financial obligations will be resolved in accordance with the applicable bankruptcy process. Accordingly, we request that you immediately notify us about this bankruptcy so that we may coordinate with both the Centers for Medicare & Medicaid Services and the Department of Justice so as to assure that we handle your situation properly. If possible, when notifying us about the bankruptcy please include the name the bankruptcy is filed under and the district where the bankruptcy is filed.

Should you have any questions, please contact your overpayment consultant at the following:

Part A - Hospice: 855-696-0705
Part A - Home Health: 855-696-0705
Part A Immediate Recoupment - Fax: 803-462-2574
Part A Extended Repayment Request: 855-696-0705
Provider - Part A: 855-696-0705

We look forward to hearing from you shortly.

Sincerely,


Supervisor, Part A Overpayments
Palmetto GBA, LLC

Enclosure: How This Overpayment Was Determined

Letter Number: 22080280

Invoice Number: ZZE042817AMD1

| Claim No. | Beneficiary Name | Patient No. | Service Date From | Service Date To | Amount Overpaid | Paid Date | Provider No. |
|---|---|---|---|---|---|---|---|
| MULTI/1711706300042B | | Not Available | | | $6,937,712.00 | | 1073820049 |

Reason for Overpayment: This claim adjustment is due to a Zone Program Integrity Contractor (ZPIC) Decision. Please refer to the letter you received from the ZPIC.

Exhibit 6

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Integrated Nursing & Health Services Inc.,

        Plaintiff,

v.

Centers for Medicare & Medicaid Services,

        Defendant.

Civil No. 17-683 (DWF/KMM)

**MEMORANDUM
OPINION AND ORDER**

---

Todd Franck, Esq., Franck Law Office, counsel for Plaintiff.

Ana H. Voss and James S. Alexander, Assistant United States Attorneys, United States Attorney's Office, counsel for Defendant.

---

## INTRODUCTION

This case involves a dispute arising from Defendant Centers for Medicare & Medicaid Services' ("CMS") decision to suspend Medicare reimbursements to Plaintiff Integrated Nursing & Health Services, Inc. ("INHS") after CMS concluded that there were credible allegations of Medicare fraud. INHS has moved for a temporary restraining order releasing the suspended payments. CMS argues, among other things, that the Court lacks subject matter jurisdiction. For the reasons discussed below, the Court concludes that it lacks subject matter jurisdiction. The Court therefore denies Plaintiff's Motion for Temporary Restraining Order (Doc. No. 13) and dismisses Plaintiff's Amended Complaint (Doc. No. 12 ("Am. Compl.")) without prejudice.

## BACKGROUND

### A.     Factual Background

INHS is a Minnesota corporation that provides home-healthcare services in mostly Hennepin County, Minnesota. (*See* Am. Compl. ¶ 7.)  INHS employs 17 people and provides services to approximately 40 homebound patients. (Doc. No. 17 ¶¶ 4-5.)  CMS is a federal agency vested with overseeing, among other things, the Medicare reimbursement program.  Here, CMS used AdvanceMed, a Medicare contractor, as its main contact point between the parties.

Pursuant to Medicare's regulations, CMS may suspend Medicare reimbursements "in whole or in part" if it has been "determined that a credible allegation of fraud exists against a provider or supplier."  42 C.F.R. § 405.371(a)(2).  The suspension can occur with or without prior notice.  If, as here, the suspension occurs without prior notice, CMS must still offer the healthcare provider the opportunity to submit rebuttal information "as to why the suspension should be removed."  *Id.* § 405.372(b)(2).  If CMS decides, however, that despite the rebuttal evidence, the suspension will continue, then the healthcare provider does not have a right to appeal until a final determination on the fraud allegations.  *See id.* § 405.375(c).[1]

---

[1]     A healthcare provider, however, is not without recourse.  CMS is required to reevaluate the suspension every 180 days to determine, among other things, whether good cause exists to lift the suspension in whole or in part.  *Id.* § 405.371(b)(2)(i).  One of the bases for good cause is that the "beneficiary access to items or services would be so jeopardized by a payment suspension in whole or part as to cause a danger to life or health."  *Id.* § 405.371(b)(1)(ii).

2

On January 31, 2017, AdvanceMed notified INHS by letter that CMS had suspended Medicare reimbursements after receiving credible allegations of Medicare fraud. (Doc. No. 12-1 (the "Suspension Letter").)  The Suspension Letter identified five examples of suspected submissions and stated that while the investigation was ongoing, all of Plaintiff's Medicare reimbursements would be reviewed and withheld in an escrow account.  The Suspension Letter also stated that the suspension had been in place since January 24, 2017.  The Suspension Letter gave the Plaintiff an opportunity to reply, but also explained that the Plaintiff had no right to appeal.  (*Id.*)

On February 6, 2017, Plaintiff replied essentially asking for more details about the fraud allegations.  (Doc. No. 12-2.)  Plaintiff also submitted documentation to authenticate the allegedly fraudulent submissions identified in the Suspension Letter. (*Id.*)  AdvanceMed wrote back on February 24, 2017, stating that the suspension would continue based on federal indictments alleging that INHS's owner Roylee Belfrey was involved in a scheme to commit Medicare fraud. (Doc. No. 12-3.)  AdvanceMed also stated that CMS would not review the documentation provided by Plaintiff because CMS had reason to question the documents' accuracy given the indictments.  (*Id.*)  The letter reiterated that the decision to suspend payments was not appealable.  (*Id.*)

**B.      Plaintiff's Complaint**

On March 30, 2017, Plaintiff filed its Amended Complaint alleging four claims that all essentially seek the same remedy:  an order releasing the escrowed payments. First, Plaintiff seeks mandamus relief to release the suspended payments based on CMS's refusal to review the documentation supporting the allegedly fraudulent claims.  Second,

3

Plaintiff alleges that it was defrauded by CMS when CMS stated in the Suspension Letter

that it would review rebuttal documentation, but then refused to do so. As a result of the

fraud, INHS alleges that it has suffered $228,000 in damages (the amount of the

suspended payments). Third, Plaintiff alleges that CMS breached an unidentified

statutory and fiduciary duty by failing to review the rebuttal documents. And fourth,

Plaintiff alleges that its constitutional due-process and equal-protection rights were

violated when CMS did not undertake a proper review of the rebuttal evidence.

On April 4, 2017, Plaintiff moved for a temporary restraining order requiring

Defendant to release the suspended funds. (Doc. No. 13.) Plaintiff argues that unless the

suspended funds are released, it will have to close. In its response, CMS argues that the

Court lacks subject matter jurisdiction. (Doc. No. 22.)[2]

## DISCUSSION

### I.      Legal Standard

Subject matter jurisdiction is a threshold issue that can be raised sua sponte by the

Court's own motion. *Hart v. United States*, 630 F.3d 1085, 1089 (8th Cir. 2011); *see also*

13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice &*

*Procedure* § 3522 (3d ed. 1998 & Supp. 2017). "It is well established that a court has a

special obligation to consider whether it has subject matter jurisdiction in every case."

*Hart*, 630 F.3d at 1089. Federal courts draw their jurisdiction from two sources: the U.S.

---

[2]      The Court will cite to Plaintiff's Memorandum in Support of Motion for
Temporary Restraining Order (Doc. No. 15) as "Memo." The Court will cite to
Defendant's Response to Motion for Temporary Restraining Order (Doc. No. 22) as
"Opp."

Constitution and a particular statute. Wright & Miller § 3522. A court must have both a constitutional and statutory basis to exercise jurisdiction. *Id.* At issue here is whether the Court has a statutory basis to exercise jurisdiction.

The party asserting jurisdiction has the burden of proof. *V S Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000). Subject matter jurisdiction may be challenged either on the face of the plaintiff's complaint or the factual truthfulness of its allegations. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). For a facial challenge—that is, even if the allegations were true, they lack an essential element for jurisdiction—a court reviews the pleadings alone and assumes the allegations are true. *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *accord Osborn*, 918 F.2d at 729 n.6. For a factual challenge to jurisdiction, the court may consider matters outside the pleadings and weigh the accuracy of the allegations. *Titus*, 4 F.3d at 593; *accord Osborn*, 918 F.2d at 729 n.6.

## II.   Subject Matter Jurisdiction

CMS appears to argue that Plaintiff's Amended Complaint cannot survive a facial challenge. (*See* Opp. at 11.) Thus, the Court will rely on only the pleadings and assume the allegations are true. *See Titus*, 4 F.3d at 593. Broadly construing Plaintiff's Amended Complaint (which identifies only 28 U.S.C. § 1331 as its basis for jurisdiction), Plaintiff identifies three bases for jurisdiction. First, Plaintiff seeks a mandamus order under 28 U.S.C § 1361. Second, Plaintiff alleges fraud and breach-of-duty claims under, presumably, 28 U.S.C. §§ 1331 (federal question jurisdiction) or 1346 (jurisdiction based

on the United States being the defendant). And third, Plaintiff claims its constitutional rights have been violated.

### A.    Mandamus Jurisdiction under 28 U.S.C. § 1361

Plaintiff seeks a writ of mandamus directing CMS to release the suspended funds. (Am. Compl. ¶ 37.) Federal district courts have jurisdiction to issue mandamus relief compelling "an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Mandamus under § 1361 is appropriate only in extraordinary situations. *Mitchael v. Colvin*, 809 F.3d 1050, 1054 (8th Cir. 2016). Mandamus may issue "when the plaintiff can establish (1) 'a clear and indisputable right to the relief sought,' (2) the state officer 'has a nondiscretionary duty to honor that right,' and (3) there is 'no other adequate remedy.'" *Id.* (quoting *Castillo v. Ridge*, 445 F.3d 1057, 1060-61 (8th Cir. 2006)). "[T]he duty owed to the plaintiff must be ministerial and a positive command so plainly prescribed as to be free from doubt." *Id.* (quoting *Keeny v. Sec'y of the Army*, 437 F.2d 1151, 1152 (8th Cir. 1971)). Put another way, the official's duty must be "clear" and "nondiscretionary." *See id.* For claims arising under the Medicare Act, a court's jurisdiction is usually limited to 42 U.S.C. § 405(g), which contains exhaustion requirements. *Heckler v. Ringer*, 466 U.S. 602, 620 (1984). Despite this general rule, courts have allowed plaintiffs to seek mandamus relief even if they do not meet the requirements of § 405(g). *Colvin*, 809 F.3d at 1055.

Here, Plaintiff argues that CMS owed a nondiscretionary duty to "properly and completely respond to" INHS's rebuttal information. (Am. Compl. ¶ 31.) The gravamen of Plaintiff's complaint is that CMS did not review or credit Plaintiff's rebuttal evidence.

CMS stated that it did not review Plaintiff's rebuttal evidence because CMS doubted the

accuracy of the records based on the indictment for Medicare fraud.  (Doc. No. 12-3.)  In

deciding whether to suspend INHS's Medicare reimbursements, CMS was required to

exercise discretion in evaluating whether there were credible allegations of fraud and

whether suspension was warranted.  *See* 42 C.F.R. § 405.372(a)-(b).  In exercising its

discretion, CMS determined that Plaintiff's records could not be given any weight.

Because CMS's duty was discretionary, the Court may not exercise jurisdiction under

28 U.S.C. § 1361.[3]

### B.     Fraud and Breach-of-Duty Claims

Plaintiff also argues that CMS committed fraud, breached a statutory or fiduciary

duty, and violated Plaintiff's Fifth Amendment rights all based on CMS suspending

Plaintiff's Medicare reimbursements.  As a general matter, CMS's decision to suspend

Medicare reimbursements is only the start of its review process.  42 C.F.R. § 405.372(c).

If CMS ultimately determines that a healthcare provider has been overpaid as a result of

Medicare fraud, the provider has the opportunity to contest that conclusion through a

series of appeals.  *See* 42 C.F.R. Part 405, Subpart I.  After exhausting those appeals, the

healthcare provider can seek judicial review.  42 U.S.C. § 405(g).  Given this

administrative scheme, the healthcare provider generally cannot skip the process and

head straight to court.  To make sure of this, Congress has expressly prohibited

---

[3]      The Court also notes that Plaintiff has failed to demonstrate that it has no other
remedy other than mandamus.  Indeed, a healthcare provider has access to four layers of
administrative review once CMS makes a final decision that the healthcare provider has
been overpaid due to Medicare fraud.  *See* 42 C.F.R. Part 405, Subpart I.

reimbursement claims from being brought under 28 U.S.C. §§ 1331 (federal question

jurisdiction) or 1346 (jurisdiction based on the United States being a defendant). 42

U.S.C. § 405(h). A court therefore usually cannot exercise jurisdiction over a claim for

Medicare reimbursements unless the plaintiff meets the requirements of § 405(g). *See*

*Ringer*, 466 U.S. at 614-15. Moreover, a plaintiff cannot avoid this general prohibition

by recasting its claims for reimbursements as some different cause of action. *Clarinda*

*Home Health v. Shalala*, 100 F.3d 526, 529 (8th Cir. 1996). That is, if at the heart of

plaintiff's claim, the plaintiff is seeking Medicare reimbursements, the plaintiff usually

must comply with § 405(g). *See id.* ("The Supreme Court has held that section 405(h)

extends to any action seeking to recover on any [benefit] claim." (internal quotation

marks omitted)).

Here, Plaintiff's claims for fraud and breach of duty would normally be brought

under 28 U.S.C. §§ 1331 (federal question jurisdiction) or 1364 (jurisdiction based on the

United States as a defendant). Thus, the Court must examine whether those claims are

really just repackaged claims for reimbursements that would otherwise be barred by

§ 405(h). Plaintiff's fraud and breach-of-duty claims both seek damages in the amount of

suspended payments and therefore are repackaged claims. (Am. Compl. ¶¶ 49, 53.) As a

result, Plaintiff must show that it complied with the jurisdictional requirements of

§ 405(g) or that an exception applies. *See Clarinda Home*, 100 F.3d at 529.

Courts have jurisdiction under § 405(g) if two elements are met: (1) the plaintiff

has presented the claim to the appropriate agency (in this case, CMS); and (2) the

plaintiff has exhausted all administrative proceedings to a final determination regarding

the claim. *Degnan v. Burwell*, 765 F.3d 805, 808 (8th Cir. 2014). CMS's decision to suspend Medicare reimbursement is not a final determination. *Clarinda Home*, 100 F.3d at 530. Indeed, CMS must still conduct an investigation to substantiate or refute the fraud, determine the overpayment, and then allow the plaintiff the opportunity to contest the determination through the administrative process. *See* 42 C.F.R. Part 405, Subpart I. Here, because Plaintiff's Amended Complaint centers on CMS's decision to suspend Medicare payments, which is not a final decision, Plaintiff has not exhausted its administrative remedies.

"Courts cannot waive the jurisdictional presentment requirement, but may, in exceptional circumstances, waive the exhaustion of administrative remedies requirement." *Degnan*, 765 F.3d at 808. A court may waive the exhaustion requirement when the plaintiff establishes: "(1) [its] claims to the district court are collateral to [its] claim of benefits; (2) that irreparable injury will follow; and (3) that exhaustion will otherwise be futile." *Id.* (quoting *Titus*, 4 F.3d at 592). Here, Plaintiff's claims are not collateral to its claim for benefits—they are precisely the same claim. *See id.* at 808-09 (affirming a lower court's conclusion that the plaintiff's claim that his Medicare reimbursement had been miscalculated was not collateral to a claim under § 405(g)). Thus, the Court will not waive the exhaustion requirements, and the Court therefore lacks subject matter jurisdiction over Plaintiff's fraud and breach-of-duty claims.

### C.    Constitutional Claim

Plaintiff also alleges that its Fifth Amendment rights have been violated. Specifically, CMS allegedly violated INHS's equal-protection and due-process rights by

failing to undertake a proper review of INHS's rebuttal evidence.  (Am. Compl. ¶ 55.)

Like its fraud and breach-of duty claims, Plaintiff's constitutional claim is just another

repackaged attempt to seek the suspended Medicare reimbursements.  And just like with

the fraud and breach-of-duty claims, a plaintiff generally cannot re-characterize a claim

for reimbursement as a constitutional violation to avoid the exhaustion requirements in

§ 405(g).  *Ringer*, 466 U.S. at 615 ("In [*Weinberger v. Salfi*, 422 U.S. 749, 760-61

(1975)] we held that a constitutional challenge . . . was a 'claim arising under' Title II of

the Social Security Act within the meaning of 42 U.S.C. § 405(h), even though we

recognized that it was in one sense also a claim arising under the Constitution.").

But even if a plaintiff has not met the requirements of § 405(g), it may proceed

with an otherwise barred claim if the plaintiff:  "(1) raises a colorable constitutional claim

collateral to [its] substantive claim of entitlement; (2) shows that irreparable harm would

result from exhaustion; and (3) shows that the purposes of exhaustion would not be

served by requiring further administrative procedures."  *Clarinda Home*, 100 F.3d at 531.

Here, Plaintiff's claim is that its due-process rights were violated by CMS

suspending its Medicare reimbursements without proper review of INHS's rebuttal

evidence.  The Eighth Circuit, however, has concluded that the suspension of Medicare

benefits during a fraud investigation does not violate a provider's due-process rights.  *See*

*id.* (concluding that a plaintiff's due-rights were not violated by suspending Medicare

payments without a hearing during a fraud investigation).  Plaintiff therefore fails to raise

a colorable constitutional claim to warrant an exception to § 405(g).[4]  The Plaintiff

therefore has failed to demonstrate that the Court has subject matter jurisdiction.[5]

## ORDER

Based on the files, record, and proceedings herein, the Court finds that it lacks

subject matter jurisdiction over Plaintiff's Amended Complaint.  Accordingly, **IT IS**

**HEREBY ORDERED** that:

1.    Plaintiff's Amended Complaint (Doc. No. [12]) is **DISMISSED**

**WITHOUT PREJUDICE**.

2.    Plaintiff's Motion for a Temporary Restraining Order (Doc. No. [13]) is

**DENIED**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: April 13, 2017              s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   United States District Judge

---

[4]    Plaintiff also alleges that CMS violated Plaintiff's equal protection rights, but
provides no additional allegations.  Thus, Plaintiff has failed to allege a "colorable
constitutional claim."  *See Clarinda Home*, 100 F.3d at 531.  The Court finds that, like
Plaintiff's due-process claim, Plaintiff's equal-protection claim fails to confer subject
matter jurisdiction.

[5]    The Court acknowledges that it is particularly concerned for the patients for whom
Plaintiff provides treatment, who might lose services if the Medicare suspension
continues.  Further, the Court sadly notes that the Medicare suspension may well affect
Plaintiff's employees, many of whom care for the patients the Court is concerned about.
But such concerns cannot alter the outcome that the Court does not have subject matter
jurisdiction over Plaintiff's claim for suspended Medicare reimbursements.